I may please the Court, my name is Ray Fasano. I represent the petitioners in this case. This Court used language this morning that's dispositive of this appeal. Judge Chowdhury, in a previous, I think, argument that we just heard, asked under what benchmark was there a value for the property. In this case, if we look at pages, or the record of page 214, 215 and 216, the agency through the immigration judge, counsel below for Mr. Chodorov, and the government lawyer had an exchange about what was the value of the extortion that the police demanded for Mr. Chodorov. Counsel indicated that there was, it represented 40% of his income. And I want to harken back to an early point that Judge Menasche said in a previous argument was, do you have anything to add? And then the Court gave counsel, who was arguing, additional time to clarify an issue. What the agency failed to do in this case was it failed to develop the record, because we don't know under what benchmark the agency through the immigration judge, with EOIR, and DHS, the government counsel, under what benchmark do they say that the amounts of extortion were petty? Is it under what we earn here in New York? Is it what we earn? Well, we have a pretty elaborate case law on this question, and we say that economic sanctions that the question is it has to amount to persecution, right? And economic sanctions that might manifest in persecution, we've said, include particularly onerous fines, large-scale confiscations of property, sweeping limitations of opportunity to continue work in an established profession or business. So the question that the agency was asking is whether these are just the kind of bribes that the country conditions evidence suggested were just common in Russia, where you are asked for bribes and so on, or it amounted to persecution on the basis of membership in a protected social group, right? So isn't that the answer? I mean, so we know what the benchmark is because it's given by our agency. Thank you for pointing that out, Your Honor. And there's a whole line of cases of settled law in this circuit under Chinese family planning cases when people who were not compliant with the one-child family planning policy, they were fined. And that fine, if it went and affected the basic necessities for the family to support themselves, that rose to the level of persecution. So the issue becomes when is that person – when is – when are economic fines rising to the level of economic persecution? And the judge, in this case, to his credit, did say it has to affect the basic – their basic ability to provide for the basic necessities. Yes, but he's applying that standard. I mean, is there – you know, he accepts the factual findings of the agency unless the record compels the opposite conclusion. I mean, is there something in the record that compels the conclusion that your client was unable to provide the basic necessities of life? There is, Your Honor, because – What is that evidence? At page 215, counsel indicated to the judge that it – that these bribes that occurred on a regular basis represented 40 – not bribes, extortion – represented 40 percent of Mr. Chatterob's income. So think about that. Almost 50 percent of your income is being given up to the government, and you were solely targeted because you're an ethnic minority. And that's another issue. And the record also shows that he was supporting a family of four. Is that right? That is correct. And is there some information in the record about how that 40 percent cut into what he could provide to his family? There isn't, Judge Cowery, and that's why we need a remand. We need a remand for the judge to do his job and develop the record to answer the questions that are left open. And the other point I wanted to make was – At the end of the day, isn't the standard here cumulative harm? Yes. So it really – it's not really whether or not – a question of whether or not those bribes amounted to past persecution or solely the basis of a credible fear of future persecution, but whether one viewed in totality the entire circumstances, including police abuse and police inaction in the face of violence, that that would give rise to a well-founded fear of future persecution. Is that right? That is correct. And that's another issue that we have to address on remand, is was the state – the government reinforced the cultural norms and societal acceptance in Russia to persecute ethnic minorities. The answer is just ethnic minorities, the extortion. If you've got widespread corruption at that level, paying corruption by the police for, you know, under $200 a hit to avoid arrest and whatever else might go on, why – and countrywide, how is that persecution directed at a particular ethnic minority? Well, because the record establishes, Judge Walker, that the state-sponsored media in Russia promotes Russian exceptionalism. It promotes xenophobia. The record at page 399 is background evidence that shows – Well, we know that there's – you know, this is not a civil rights complaint in the United States. This is a persecution complaint against Russia. And whether – you know, the Russian society, it's quite obvious this case is a good example, does a lot of intolerable things that would offend us here. But it's not – that obviously can't be the test in persecution cases. You know, asylum is not that – is not that frequent. I mean, you can't give asylum to everybody who comes here and complains about paying corruption in Russia. Your Honor, may I just – I know I'm over my time, but I have to answer this. Yes. Pardon? You can answer the question. Thanks. Judge, the – once found credible, which Mr. Chororov was found credible by both the immigration judge and the Board of Immigration Appeals, he just has to show a 1 in 10 chance that he would – that, A, he'd be persecuted, and, B, that he was persecuted. And I want to just – Well, that's exactly what the agency was focused on. So you're talking about, well, there was xenophobia and so on, but the BIA says explicitly we think he was subjected to discrimination. There is discrimination. But the question we have to answer is whether it rose to the level of persecution. Right? So those are separate questions. So it seems to me the agency did not overlook evidence that there is discrimination in Russia and acknowledged that he was subjected to discrimination. The question is persecution. And in the most serious incidents that he alleges, which is the being hit by a car or the passport being withheld by his employer, he testified that actually the police came in and provided him some kind of remedy. So it means that he gets police protection in some cases, right? So it's not like the government is condoning the private acts of hostility or that it's unable to provide any protection, right, which is the standard for when private persecution might be issued to the government. May I respond to that, Your Honor? Sure. Thank you. And Your Honor's right. The record does establish that. However, what the agency did was they viewed that mistreatment through the lens of a private actor. They ignored the fact that, and James Madison, Federalist No. 51, says the government reflects the human nature. It reflects the culture. And with the background evidence that I indicated at page 315, it really is the government You know, that's, I mean, you can't. So what you're saying is because there was private discrimination and private violence, we should just decide that all of the society is corrupt and must infect the government. But the record does not compel that conclusion. Because if you have cases where they engage in some acts of, there are private parties that engage in some acts of discrimination, like withholding his passport, and then the police respond by prosecuting the person who withheld his passport, or he's allegedly hit by a car and the authorities suspend that driver's license, it means that the government is doing something to protect him. So the idea that we could just say because there's discrimination in society, the government is necessarily discriminating seems to conflict with the record and also with our case law, which says in order to say that private violence or private discrimination is attributable to the government, the government needs to condone it or be totally unable to help the victims of it. One last point I want to make, Your Honor. If I may. Thank you. When we have questions, you can say. Thanks, Judge. I know. The panel has only given five minutes. In any event, thanks for the time. I'm going to urge this Court, please, if you want a 28J letter, I'll provide one. But matter of ARCG at 26, INN decision 388, that's a poor decision, as of course probably you're aware, that addresses private action where a woman who cannot leave a relationship cannot flee the domestic violence within that relationship. And in ARCG, the Board talks about, you know, the government attempting to protect this woman from the domestic violence, and it cannot be a more private act than domestic violence. And I think if this Court reads ARCG with this record, they could extend that reasoning to Mr. Charteroff's case. I have another question, which is, you know, he does have some allegations that there were these other kinds of meetings, and then he went to the police, and the police told him they couldn't do anything or he should avoid it and so on. But then I went back to the record, and the IJ is asking him about these instances where he's being beaten. And he says on several occasions, and then the immigration judge asks, why don't we have any medical records? And he says there's only a medical record for the incident with the car and the driver. And that's when the police responded, right? So it seems like what the agency concluded was because there were no medical records for these other instances that he alleges that they were not serious. Is that right? Is there anything in the record that would compel the opposite conclusion, that these other meetings that he mentions actually were so severe that under a case law rose to the level of persecution? I would ask the Court to look at pages 148 and 150 of the record, where he went to the police to complain about those meetings, as Judge Banasch just indicated, and the police did nothing. No, that's exactly what I'm talking about, right? So I have page 148, and he's saying, was it only the police that you feared? He says, I was also afraid of racists and fascists. What would they do? He says they would yell out, leave the country. Were you ever beaten? And then he says yes, and he says he doesn't know how many times. And the IJ says, did you ever seek medical attention? He says he did, and then he's asking, you know, do you have medical records? But the only medical records in the record are the ones from the driving. I'm sorry, Your Honor. I missed Your Honor's point. My apologies. There are no other medical records. The beatings, you know, just sighting, you know, just – Right, so the only evidence of that is his testimony that in response to questions from the immigration judge it happened, but we don't have records about the severity or the frequency or the reasons why the police didn't respond. You know, the police responded in the incidents that he says are the most serious, which is the car and the passport scheme. The only closing point I wanted to make before my rebuttal is at page 150 of the record, he credibly testified referring to the police. They would keep silent and take no action. Okay. Thanks. Thanks for the time. You reserved some time for rebuttal. I did. I'm here for you again. Let's turn to the government. Mr. Geiger. Good morning, Your Honors. May it please the Court. Christopher Geiger for the Attorney General. Your Honors, the petitioners have not demonstrated that the past harm they experienced rises to the extreme level of persecution. And I want to clarify that it is the petitioner's burden to establish eligibility for asylum and withholding of removal. And as it relates to past persecution, it is the petitioner's burden to also indicate that the record compels the conclusion that any harm they experience rises to that level. And they have not done so here. My friend on the other side mentions a lineage of cases that brings to light instances when economic persecution rises to that level, specifically Chen v. Holder when the Chinese government imposed a fine. And I want to distinguish that case where, in Chen v. Holder, the Court had in front of them what the salary was of the petitioners at issue in that case, where here the petitioners have not put forward any indication whatsoever as to how the impact of the Russian authorities, their extortion had on him. We don't know beyond that. We don't know how many there were. Multiple extortions could be five. It could be a number. It could be 50. It could be 200. We don't have any of that, do we? No, we don't, Your Honor. And that's exactly the problem with this is that, and in Chen v. Holder, this Court emphasized that economic persecution, the emphasis is on the impact that the economic sanction has. So you're saying if in fact it was true that it limited his ability to provide for his family and so on, that might amount to persecution? If he demonstrated that the extortion amount did impact it. But what about this argument that it was 40 percent of his income? That argument is entirely speculative, Your Honor. At page 215 of the record, as opposing counsel referenced, that is the point in the merits hearing where the petitioners then counsel speculatively used the word he guessed what the average salary of a Russian individual was and that using that guess, the extortion amount in this case would then be 40 percent. So even if that particular issue of economic harm, so 40 percent, let's just take that as a given, if that doesn't rise to the level of persecution, what about looking at the record cumulatively? It looks like the IJ actually looked at each of these allegations or each of these pieces of evidence in isolation and assessed whether each one amounted to persecution. But that's not what the law requires. The law requires looking at cumulative harm, even if no one situation actually rises to the level of persecution. I respectfully disagree, Your Honor. I think best read, the agency did cumulatively consider the harm, particularly when we look at page- But how do you know what the cumulative harm was? I mean, this is my earlier question, because it's a function of how often this happens. Well, that's – that part would go to, Your Honor, that the petitioner didn't meet – the petitioners haven't met their burden to demonstrate and put forward evidence demonstrating that the harm they experienced rises to that level. So that goes to your – Judge Walker. Do you want me to know how often it happened in order to decide the cumulative effect? So if, in fact, we say there are regular requests for bribes, even if it happens all the time, if it's the kind of low level that applies to everybody within Russia, then no matter how often it happens, it doesn't rise to the level of persecution because it's not singling him out, right? And that's what the – that's what the agency thought, right? Yes. Yes. And if there are beatings that are not so severe that, you know, under our case law they rise to the level of persecution, I mean, I suppose he could say this happens to me every day, and that means that, like, you know, even if he wouldn't otherwise say it rises to the level it does, but it would be his burden to point that out. The IJ, as I read it before, was specifically asking about that kind of conduct. He would have said so. Yes. So there really isn't anything – I mean, so do you think there's anything missing from the record that should have been there, or are there any gaps that we need in order to evaluate the cumulative effect? No. This Court can and should hold that the petitioner has not met their burden of establishing that the past harm rises to that extreme level. What about this testimony that I was pointing out where he says that he was beaten sometimes, that he went to the police and the police didn't do anything? Does that indicate that the government was either condoning the violence or was unable to prevent it? Even if there was some indication that the police are unable or unwilling, just because there is some evidence in the record, that doesn't mean it compels that the record – or it doesn't compel that the Russian authorities were unable or unwilling. And I think that's the difference, because we do have two distinct instances here. Separate instances were two private individuals, as Judge Bonacci, you referred to previously, where they did harm the petitioner, and he went to the police. And the police responded, right? Exactly. So we have cases where the most severe incident, which is the one with the car, where the police actually did respond. And so if he says that there were some incidents in which we don't have any medical records or we don't know the severity of it and the police didn't respond, then the inference could be they weren't as serious as the ones where they responded. Or, you know, the inference might be that there's something wrong with the police, but the question here is whether the record compels the conclusion that the police condoned it. And because there's evidence the police did prosecute private parties that had harmed him, the record doesn't compel that conclusion. Yes. Yes, Your Honor. And if I could have a moment for one brief, I want to respond to Chowdhury. I don't think I have to finish your question about the cumulative effects. I think on page four of the record, best read, the agency does go through. We look at the first paragraph and the final paragraph, where the agency discusses all of the harm by the cumulative or by private actors and the police in that first paragraph and then again in the final paragraph. And I just want to clarify. I think the agency actually missed recounting some of the evidence about police beatings and things of that nature, but go ahead.  On page 175 and 194 of the record, the petitioner specifically clarified that the police did not beat him, that he did refer to it earlier in his testimony, but then later there are those two incidents that he clarified that the only harm that the police did was the extortion against him. And so the IJ says, how come you don't have any medical records of what other individuals, you said that the police beat you. Why don't we have records of that? And he says, I never received any documents that the police didn't beat us. They would just take away our passports and extort, right? Yes, correct. That's exactly what I'm referring to. But he does talk about being beaten by private parties and saying he didn't get help from the police, and that's what I was asking you about before. He does, yes. And you were saying that the inference might be that they were not as serious as the cases where the police didn't respond. Yes, and that rolls into specifically the unable and unwilling, and as it goes to the cumulative harm prior to the unable and unwilling analysis. In that first paragraph, the agency does discuss harm by private actors and specifically refers to derogatory slurs, theft, and harm. And it can't be that the agency overlooked the testimony about the police response to the purported beatings because the IJ elicited the testimony from him, like this is questioned by the immigration judge, so it clearly was considered by the agency. Correct, Your Honor. So ultimately here the petitioners have not met their burden in demonstrating that the harm they experienced rises to the extreme level of persecution. Are there no other questions? The only question I have is do you know, maybe it's in the country reports, about the requirement of carrying a passport around? Is that confined to minorities? Is it true of every citizen? Apparently here there was a practice of encountering the police. The police would ask for the passport, they'd get the passport, and then they'd require money to get it back. Do you know anything about passport rules and carrying passports? I don't know necessarily specifically about the passport rules. However, there are reports that Russian authorities, when they see a minority specifically from Central Asia or other parts, they don't ask for their papers. And so I think that refers to the passports as well that goes to that. Thank you, Your Honor. Thank you very much, Mr. Geiger. We'll turn back to Mr. Fasano. Thank you, Your Honor. Just to answer Judge Walker's concern about how often was Mr. Charteroff extorted by the police, we don't know that. But what we do know from the record at page 146 was that practically every day he was referred to as a Cherka, which is the lowest ethnic slur that a person from Kyrgyzstan could be referred to by people in the public, by nationalists, racists, and Nazis. And I do understand that. But the agency does say he was subjected to discrimination, and you are saying the society is discriminatory. That's true. But the question here, you're not eligible for asylum because the society is discriminatory. The question is whether he's being persecuted by the government, right? That's correct, Your Honor. But when viewed cumulatively, which wasn't done here, and we, you know, I would urge the Court Well, why should the use of slurs by private parties even be part of the cumulative analysis? Because the question is persecution. And private parties calling you names is not persecution. Oh, Your Honor, it's most respectfully, it's much worse than a name. He was dehumanized by being called a Cherka. That's the piece of evidence. Right. But that's why we have the Pauli D'Souza and Ivan Shilley standard of looking through the, looking at the evidence cumulatively. I'm not disagreeing. Right. What's the tie between the slur and government persecution? At case 315? Usually when we have activity by private parties, the question is it becomes persecution by the government if the government condones it or is completely unable to interfere. I mean, you know, it's not obvious the government even would, like in this country, if somebody uses a slur, the government doesn't interfere. It's not like obviously the government had to interfere. So what's the tie between this evidence reciting and government persecution? Thank you, Judge Manasci. The ties are pages 329, 340, and 359 of the administrative record where the record shows police regularly target ethnic minorities. Mr. Kharadov put targeted for extortion. Public opinion is dominated by xenophobia. That's promoted through state-sponsored media. Russian believe in their exceptionalism causes xenophobia. And I think it's terribly important that we look at the fact that the agency ignored that. The Russian government reinforces these cultural norms. It's a cultural norm to treat ethnic minorities differently. They sure did. Pardon me, Your Honor, I don't want to interrupt. But when they present evidence like Mr. Kharadov did, yes, I would argue the answer is in the affirmative, Your Honor. And it's the tie that this societal discrimination then could lead to further harm by private actors that then the police don't follow up on. So, for example, I think you mentioned before about the incident in which another individual essentially tried to kill Mr. Kharadov. And he was also from Kazakhstan. That's a big issue. And I'm so, so sorry to interrupt you, Your Honor. But the record reflects that. And I think the judge did say this. He received a minimum of punishment and he was ultimately deported, which was the government's extension of applying punishment to a minority, someone from the same. I mean, that's a very weird argument for you to make because this is the guy who caused harm to your client. The authorities came in, penalized him for the harm, and also deported him from the country, which you'd normally think would be the government's protecting him. And now you're saying, well, because he was part of the same minority, it just shows that actually my client was even more persecuted. But, I mean, the IJN, and I think the record doesn't compel a different conclusion, or the agency, said that that actually showed that he had some degree of police protection. Just to answer that, Judge Cattery, I'm sorry that I did interrupt you because I didn't know if Your Honor had a question for you. But I just want to address Judge Benashi's question. Your Honor, if we read ARCG in the domestic violence cases, we do see instances where there is police protection, so to speak, of the victim of domestic violence, whether it be an order of protection, they arrest the abuser, and then the abuser gets out of police custody and he continues his sentence. He continues his campaign against his victim, whether it be by stalking, harming her, or doing something else that causes her to flee her home country. So just because the police respond to an incident does not necessarily mean that the State is now absolved of any liability. Well, maybe it doesn't necessarily mean it, but if we say that we're going to accept the findings of the agency unless the record compels the opposite conclusion, does the record compel the conclusion that the police are either condoning violence against him or unable to protect him from violence? I think it does, Your Honor. When we compare what was developed in this record, which still has to be developed where the judge did not do his job by developing a record on the benchmark for the economic harm that Mr. Chardoff suffered. But when we – with the record that has – I'm asking the burden on the applicant to establish eligibility for asylum. Oh, that's – excellent points, Judge, and that's the one point that I neglected. If you read this record, counsel was – I think did a great job by establishing the mistreatment. And I think at one point in the record he says, I don't know, Judge, I could go on – in some substance he says, I could go on and on. Is there anything further that the Court needs? And Judge Palmer said, no, I think we have enough here. I mean, listen, Judge, you know, we react at trial with, you know, the data that we have in front of us. I think he felt that he made his record. I'm sorry. He did. So he made the record. He had the opportunity to present what he thought was relevant evidence, and he presented it. But that's why the immigration judge – he is bridled with the duty of developing the record. Just to be clear, he didn't cut him off. No, he did not. Okay. But he kind of led everybody to believe when we read this record that the record – there was enough there. Judge, was there a question that I didn't get to answer? No, there wasn't, but I did want to clarify a point. You had mentioned that the driver who tried to run over and, in fact, run over your client, he was not an ethnic minority, correct? It was the person who stole his passport who was an ethnic minority and was deported. The person who tried to run him over was not a minority, was not deported, and received a very minimal sanction. Isn't that right? I say correct. My apologies. Yes, Your Honor. Okay, thank you. Thank you. If there's nothing further, I'm sorry, Judge. I'm just going to clarify that. It's the person who held his passport who then got deported. That's right. And the driver, his license was suspended. Yes. Okay. Thank you for the additional time. And just one more point. Did the IJ consider the fact that when he did report extortion to the police, that the police indicated to him that he would have problems? To what degree was that fact accounted for by the IJ and the determination? I don't believe it was. If it was at all, it was negligible. And that issue wasn't developed, Your Honor. Okay. And did the BIA address that issue as well, that the police threatened he would have problems? I didn't read that in the decision, Your Honor. Okay, thank you. Thank you. Okay, thank you.